**REMEDIAL DESIGN/REMEDIAL ACTION**

**STATEMENT OF WORK**

**OPERABLE UNIT OU 01**

**Ballard Mine SUPERFUND SITE**

**Soda Springs, Caribou County, State of Idaho**

**EPA Region 10**

**January 2021**

# TABLE OF CONTENTS

1.    INTRODUCTION .................................................................................................1
2.    COMMUNITY INVOLVEMENT AND TECHNICAL ASSISTANCE...........................8
3.    REMEDIAL DESIGN ........................................................................12
4.    REMEDIAL ACTION.......................................................................15
5.    REPORTING ...................................................................................21
6.    DELIVERABLES...............................................................................22
7.    SCHEDULES ...................................................................................30
8.    STATE AND TRIBAL PARTICIPATION.................................................32
9.    REFERENCES ...................................................................................33
10.   CONSTRUCTION PHASES..............................................................36

## ACRONYMS

| | |
|---|---|
| ARAR | applicable or relevant and appropriate requirements |
| BMP | best management practice |
| BODR | basis of design report |
| CD | Consent Decree |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| CCR | Construction Completion Report |
| CIC | Community Involvement Coordinator |
| CIP | Community Involvement Plan |
| CL | cleanup level |
| COC | chemical of concern |
| CQA/QCP | Construction Quality Assurance/Quality Control Plan |
| EDD | electronic data deliverable |
| EPA | U.S. Environmental Protection Agency |
| ERP | Emergency Response Plan |
| ET | evapotranspiration |
| FS | Feasibility Study |
| FSP | Field Sampling Plan |
| FYR | Five-Year Review |
| GIS | geographic information system |
| HASP | Health and Safety Plan |
| IC | institutional control |
| ICIAP | Institutional Controls Implementation and Assurance Plan |
| IDW | investigation derived waste |
| IQAT | Independent Quality Assurance Team |
| LTM | long-term monitoring |
| LUC | land use controls |
| LOI | Letter of Intent |
| MNA | Monitored Natural Attenuation |
| MNR | Monitored Natural Recovery |
| NPL | National Priority List |

| | |
|---|---|
| O&M | operation and maintenance |
| OSWER | (EPA) Office of Solid Waste and Emergency Response |
| OU | Operable Unit |
| PDI | Pre-Design Investigation |
| PDIWP | Pre-Design Investigation Work Plan |
| PRB | permeable reactive barrier |
| PRP | potentially responsible party |
| PRSP | Periodic Review Support Plan |
| QA/QC | quality assurance/quality control |
| QAPP | Quality Assurance Project Plan |
| RA | Remedial Action |
| RAO | Remedial Action Objective |
| RAWP | Remedial Action Work Plan |
| RD | Remedial Design |
| RDWP | Remedial Design Work Plan |
| RI | Remedial Investigation |
| ROD | Record of Decision |
| SD | Settling Defendant |
| Site | Ballard Mine Site |
| SOW | Statement of Work |
| SPCC | Spill Prevention, Control, and Countermeasures |
| SWPPP | Stormwater Pollution Prevention Plan |
| TAP | Technical Assistance Plan |
| TODP | Transportation and Off-Site Disposal Plan |
| TS | Treatability Study |
| TSWP | Treatability Study Work Plan |

1.   **INTRODUCTION**

1.1   **Purpose of the SOW**. This Statement of Work (SOW) sets forth the procedures and requirements for implementing the Work.

1.2   **Structure of the SOW**

- Section 2 (Community Involvement) sets forth EPA's and Settling Defendant's (SD's) responsibilities for community involvement.
- Section 3 (Remedial Design) sets forth the process for developing the Remedial Design (RD), which includes the submission of specified primary deliverables.
- Section 4 (Remedial Action) sets forth requirements regarding the completion of the Remedial Action (RA), including primary deliverables related to completion of the RA.
- Section 5  (Reporting) sets forth SD's reporting obligations.
- Section 6 (Deliverables) describes the content of the supporting deliverables and the general requirements regarding SD's submission of, and EPA's review of, comment on, approval of, and/or modification of, the deliverables.
- Section 7 (Schedules) sets forth the schedule for submitting the primary deliverables, specifies the supporting deliverables that must accompany each primary deliverable, and sets forth the schedule of milestones regarding the completion of the RA.
- Section 8 (State and Tribal Participation) addresses State and Tribal participation.
- Section 9 (References) provides a list of references, including URLs.

1.3   The Scope of the Remedy includes the actions described in the Ballard Mine Site Record of Decision (ROD), including the key components of the remedy summarized below, but does not include any ore recovery that Settling Defendant plans for or conducts at the Site before or during implementation of the remedy, or any application for any federal, state, or local permit required for or associated with such activity:

**Waste Rock Consolidation and Engineered Cover System**

- Portions of waste rock dumps will be excavated, transported, and placed into mine pits to cover exposed ore beds and shale units of the Phosphoria Formation. Remaining waste rock in mine dumps and backfilled pits will be graded and shaped to ensure geotechnical stability, and to promote runoff away from potential source areas. Grading plans will minimize expansion of the exterior boundaries of existing disturbance. Remedial construction activities will be sequenced so that excavated and regraded waste rock will be covered soon after grading to minimize potential for releases of contaminants.

- An evapotranspiration cover (ET cover system), approximately 5 to 6 feet thick, or as determined in the RD process, will be constructed over all areas of the Site where waste rock is present. The ET cover system will be comprised of two layers. A layer

of coarse unimpacted material (such as chert) will be placed above the regraded waste rock surface to serve as a capillary break (approximately 1 foot thick). Above the capillary break layer, a layer of medium-textured alluvium will be placed. The cover material will be designed to store water during wet periods and release water back to the atmosphere via evapotranspiration during dry periods. The cover will be constructed of material of suitable quality to sustain and perpetuate healthy vegetation, and to accommodate the rooting depth of native plants without intercepting waste rock. The final configuration and dimensions of the cover as well as material properties and thicknesses will be refined during RD.

- The approximate footprint of the cover, assuming SD conducts ore recovery during the implementation of the RA, is presented in the ROD (Figure 12-4). The cover will extend over areas impacted by historical mining, including any area where waste is left in place, and over areas where original waste rock dumps were excavated for placement into pits to prevent exposure to contaminated soils. Ore recovery during RA will be limited to the capped area as shown in Appendix C of the Consent Decree that is within the approved Bureau of Land Management ore lease boundary.

- Performance of the cover system will be evaluated by inspections, spring and seep surveys, instrumentation, and by comparing the concentration of contaminants in surface water and groundwater at downgradient monitoring stations to cleanup levels.

- Fill material for the various construction phases will be imported from the borrow areas used to construct the cover, from borrow sources exposed or waste rock produced during potential ore recovery, or from other sources if ore recovery does not occur or does not generate sufficient fill material. Final ET cover design and geometry will be optimized during the RD to shed runoff and blend into the surrounding natural topography.

- Operation and maintenance (O&M) requirements will be developed and implemented. Institutional controls (ICs) and land use controls (LUCs) will be implemented to restrict access, protect the integrity of the cover, and protect human health and the environment.

- Approved-seed mixes and vegetation types will be planted to form an extensive root system to penetrate the majority of the vertical cover profile (without intercepting waste rock), slow the flow of stormwater and snowmelt runoff, limit erosion, and transpire water that infiltrates the cover. Routine long-term monitoring will be performed to inspect the cover for erosion and plants incompatible with the cover system (i.e., deep rooted species and selenium accumulators such as Asters).

- RA will be implemented using a phased construction approach, as described in Section 10, below. The actual number and sequence of construction phases will be refined during RD to optimize implementation. To the extent practicable, the ET cover will be constructed during the same construction season in areas where waste rock is placed, and final grading is completed. Under the phased construction

2

approach, specific additional requirements for planning and coordination will apply. These include submittal of annual construction reports, and annual meetings to discuss plans and design changes for the following year's implementation of the RA. The enhanced coordination will allow the RA to proceed under either of two general tracks: (1) if ore recovery is permitted and proceeds; or (2) if ore recovery is not permitted (or not permitted before the deadline set for the Start of Construction set forth in Section 7.3 (RA Schedule), or if SD decides not to proceed with ore recovery.

**Permeable Reactive Barriers**

- Permeable Reactive Barriers (PRBs) will be installed downgradient of the source areas, near the margins of the waste rock dumps, to intercept and treat contaminated shallow alluvial groundwater to reduce selenium and other contaminant of concern (COC) concentrations to less than cleanup levels. The PRBs will be sited upgradient of select perennial seeps and springs. The approximate number and locations of PRBs are illustrated in the ROD (Figure 12-5).

- The specific location, geometry, and composition of each PRB will be determined by the results of RD treatability and/or predesign studies along with other directly applicable research involving PRBs from local phosphate mines. Each PRB will be designed for its unique location. In some cases, where the affected alluvial groundwater is excessively deep, extraction wells may supplement the system and discharge to the PRB.

- Each PRB will be comprised of a trench filled with reactive media that is designed to intercept and treat shallow alluvial groundwater. Treatability testing will determine an appropriate reactive media mix for Site COCs (e.g., organic materials, sand and limestone, iron filings, or other materials). The selected mix of media will have permeabilities appropriate for the hydraulic conductivities of surrounding materials and adequate retention times to treat the target contaminants to cleanup levels.

- Performance of the PRBs will be assessed using monitoring wells located up- and downgradient of the PRBs and at downgradient springs and seeps where groundwater discharges. If contaminant concentrations in groundwater are not reduced to cleanup levels by the PRBs, an adaptive management strategy will guide decisions on follow-up actions, which may include revisions to the PRBs. Monitored natural attenuation ("MNA") will be used as a polishing step to further reduce concentrations of contaminants in distal portions of alluvial aquifers (see Section 12.2.4 of the ROD).

- Decision rules for determining media testing, replacement, disposal procedures, and whether PRBs may be decommissioned in place (after groundwater treatment is complete and meets cleanup levels) will be developed during RD. ICs will be implemented to protect the integrity of these remedial elements.

**Wetland Treatment (Bioreactor) Cells**

- A series of engineered wetland treatment cells will be constructed and operated, on Site margins, to treat contaminated, perennial mine-affected seeps and springs, as necessary. The approximate number and location of the wetland treatment cells are identified in the ROD (Figure 12-6). Wetland treatment cells will be placed downgradient of planned PRB locations in areas where the PRBs have not treated groundwater to below the surface water cleanup levels ("CLs"). Flow from nearby springs and seeps will be captured if above CLs and conveyed to one of the wetland treatment cells. Likewise, flow from seeps and springs within the footprint of the mining disturbance will be captured if above CLs and conveyed to a wetland treatment cell.

- A conceptual cross section of a wetland treatment cell is presented in the ROD (Figure 12-2). Actual dimensions and construction details, flow rates, and water retention times will be determined during RD. The treated water will flow out of the treatment cells to the downstream drainages or evapotranspire within the treatment cells. Cleanup levels will be met where treated water is discharged. A monitoring program will assess effectiveness of the wetland treatment cells and will include periodic testing of influent and effluent.

- During RD, the number, location, and size of the wetland treatment cells will be refined. In siting the location of wetland treatment cells, potential impacts to delineated wetlands and other waters of the United States (Newfields, 2017) will be considered as part of substantive compliance with Section 404 of the Clean Water Act, 33 U.S.C. § 1344.

- The treatment effectiveness of the bioreactors in some areas will be enhanced by the PRBs that are installed upgradient to treat the shallow groundwater before it discharges at the seep locations (see ROD Figure 12-5 and the groundwater discussion in Section 12.2.2 of the ROD). Monitoring will be conducted to determine if PRBs are treating groundwater to achieve CLs. If the surface water exiting the PRBs is below CLs, then wetland treatment cells will be unnecessary.

- Wetland treatment cells may be retired over the long-term if cleanup levels are achieved. Decision rules for determining media testing, replacement, disposal procedures, and whether wetlands may be decommissioned in place will be developed during RD.

- ICs and LUCs will be developed and implemented to prevent human exposure to contaminants at the treatment facilities and to protect the integrity of these features.

**Monitored Natural Attenuation of Groundwater**

- If levels of contaminants in groundwater remain elevated above cleanup levels following implementation of other elements of the remedy (ET Cover, PRBs, and

wetland treatment cells), MNA will be used as a polishing step to achieve cleanup levels. Additional data (evaluation of the minerology of aquifer solids, dissolved organic carbon, redox conditions, and other relevant information) will be obtained during RD to refine estimates of contaminant sorption and attenuation rates. Use of MNA will require routine groundwater monitoring, periodic data analysis to evaluate removal mechanisms and track the progress of natural attenuation, and implementation of an adaptive management strategy (see Section 12.2.7 of the ROD).

**Stormwater and Sediment Control Best Management Practices**

- During construction, sediment traps or basins will be constructed in the upper reaches of mine-affected drainages to capture or control mine-affected sediment entrained by stormwater, allowing sediment to settle out and less turbid water to continue downstream. The basins will provide control points for sediment-laden runoff from the Site during construction and through maturation of the remedy and establishment of vegetation on the cover. During RD, the number, location, and size of the sediment basins will be refined. In siting the location of these best management practices (BMPs), potential impacts to delineated wetlands and other waters of the United States (Newfields, 2017) will be considered as part of substantive compliance with Section 404 of the Clean Water Act, 33 U.S.C. § 1344. In addition, other BMPs will be specified during RD and will include a broad suite of techniques to control erosion, such as use of compaction, construction sequencing, straw mulch and wattles, silt fences, and other methods.

- Sediments in these traps and basins will be sampled to determine if COCs are above the CLs. Sediments verified as contaminated from these structures over the long term will be placed under the ET cover during the RA, and disposed in a designated, properly designed, onsite landfill as needed after RA is completed.

- The RD and RA work plan deliverables will include location and construction of sediment traps and basins, including design information, design of temporary roads, engineered access restrictions, a site restoration plan, a health and safety plan, and a stormwater management plan. ICs will be implemented to protect the integrity of these features and to prevent human exposure to contaminated sediment. Effectiveness will be evaluated through monitoring.

**Monitored Natural Recovery for Sediment**

- Implementation of monitored natural recovery ("MNR") during the RA will include routine sediment and riparian soil sampling in impacted stream corridors down to the confluence with the Blackfoot River, and periodic data evaluations to monitor the progress of natural recovery and to support CERCLA Five-Year Reviews (FYRs). This remedial element requires implementation and enforcement of ICs to prevent human exposure to contaminated sediment and riparian soil (more than 10 years beyond remedy completion).

- Implementation of MNR will include a preliminary study to predict the effectiveness of MNR processes, identify and designate downstream sampling stations, and collect baseline samples. Initiation of MNR during RA will require an approved long-term sampling and analysis plan, designated riparian soil and vegetation sampling frequencies over a timeframe specified during RD, and periodic data evaluations to track progress and support CERCLA FYRs.

**Adaptive Management**

- A sitewide adaptive management plan will be developed during RD and implemented during RA. The adaptive management plan will describe a structured iterative process for making management decisions for elements of the remedy with significant uncertainty or vulnerability regarding performance. The plan will provide a linkage and feedback loop between various stages of remedy implementation, including design, construction, monitoring and comparison to cleanup levels and performance specifications, and potential management actions and responses. The adaptive management plan will include the following elements:

    o Problem statement, including a description of vulnerabilities, uncertainties, and potential consequences associated with key components of the remedy.

    o Monitoring strategy that includes specific indicators and describes the type, amount, and quality of information needed to make management decisions.

    o Performance thresholds for initiating follow-up actions, including cleanup levels, and performance goals and specifications.

    o Potential management actions and responses to address unanticipated monitoring results or conditions. These may include additional designs, design modifications, or operational changes to optimize the performance of remedy components, correct design oversights or construction defects, or other actions necessary to achieve intended remedial outcomes.

    o Follow-up actions and modifications made through the adaptive management process would not constitute a significant or fundamental change to the Selected Remedy.

**Operation and Maintenance**

- An O&M plan will be developed during RD.

- The O&M plan will address, but is not limited to, maintenance and repairs of the permanent and secondary access roads, associated stormwater control and drainage features, and the ET cover (e.g., erosion of cover material, drainage issues, enhancing vegetative growth on the cover, and other issues to ensure sustainability).

- The plan will address all aspects of operation, maintenance, and repair of the PRBs, engineered wetland treatment cells, sediment traps and basins, groundwater monitoring well networks, and general BMPs for treatment facilities (e.g., dike or berm repairs, spent media replacement, proper disposal of excavated sediment trap and basin material, rodent control, maintaining engineered ICs to restrict access, and other issues as needed).

- The plan will include best practices for operating and maintaining treatment features, schedules (short- and long-term) for implementing maintenance of all remedial site features, and records for documenting conditions encountered and remedial action applied.

- The O&M Plan will be updated annually.

**Long-Term Monitoring**

- A long-term monitoring ("LTM") plan will be prepared and implemented to track and measure progress toward achieving remedial action objectives and cleanup levels. The monitoring program will include sampling and analysis of groundwater, surface water, sediment, riparian soil, vegetation, and upland soil and monitoring of the ET cover as discussed above.

- The information collected through the LTM program will support the FYR process.

**Institutional Controls and Access Restrictions**

- The ICs will be tailored to the property to provide protection of human health and to maintain protectiveness until cleanup objectives are met. ICs may be selected and implemented on a parcel basis or implemented for specific components of the Selected Remedy. Site-specific ICs will be determined during RD/RA and will include at least the following:

  o Restrictions on drilling of water supply wells where contaminated groundwater is present. These restrictions would remain in place until cleanup levels are achieved.

  o Legally enforceable deed restrictions or environmental covenants under the Uniform Environmental Covenants Act, I.C. § 55-3001, *et seq.*, applied to current and future owners of lands that comprise the Site to prevent any future residential use. These deed restrictions or environmental covenants would also be structured to prevent or limit future land uses to preserve and safeguard the cover system or treatment components of the remedy.

  o Community outreach, including public notices, fact sheets, or onsite signage to provide notice of contamination on the property and to discourage uses that could lead to unacceptable exposures.

   o LUCs such as fencing (an engineering control), locked gates, and signage to discourage public access (offroad vehicles) to the cover, PRBs, wetland treatment cells, and areas where MNR is being implemented, and to protect the integrity of the remedy.

**Green Remediation**

- The RA will be carried out consistent with EPA's Region 10 Clean and Green Policy (EPA, 2009b), including utilizing the following practices:

   o Use renewable energy and energy conservation and efficiency approaches, including Energy Star equipment.

   o Use cleaner fuels such as low sulfur fuel or biodiesel, diesel emissions controls and retrofits, and emission reduction strategies.

   o Use water conservation and efficiency approaches including WaterSense products.

   o Use locally sourced materials when available and financially competitive.

   o Use reused or recycled materials within regulatory requirements.

   o Minimize transportation materials and use rail rather than truck transport to the extent practicable.

1.4 The terms used in this SOW that are defined in CERCLA, in regulations promulgated under CERCLA, or in the Consent Decree ("CD"), shall have the meanings assigned to them in CERCLA, in such regulations, or in the CD, except that the term "Paragraph" or "¶" means a paragraph of the SOW, and the term "Section" means a section of the SOW, unless otherwise stated.

1.5 The term "contaminants of concern" or "COCs" shall mean the chemicals listed in Tables 5-1 and 5-2 of the ROD.

## 2. COMMUNITY INVOLVEMENT AND TECHNICAL ASSISTANCE

2.1 **Community Involvement Responsibilities**

(a) EPA has the lead responsibility for developing and implementing community involvement activities at the Site. Previously during the RI/FS, EPA developed a Community Involvement Plan ("CIP") for the Site. Pursuant to 40 C.F.R. § 300.435(c), EPA shall review the existing CIP and determine whether it should be revised to describe further public involvement activities during the Work that are not already addressed or provided for in the existing CIP, including any Technical Assistance Plan ("TAP").

(b)     If requested by EPA, SD shall participate in community involvement activities, including participation in (1) the preparation of information regarding the Work for dissemination to the public, with consideration given to including mass media and/or Internet notification, and (2) public meetings that may be held or sponsored by EPA to explain activities at or relating to the Site. SD's support of EPA's community involvement activities may include providing online access to initial submissions and updates of deliverables to (1) any Community Advisory Groups, (2) any Technical Assistance Grant recipients and their advisors, and (3) other entities to provide them with a reasonable opportunity for review and comment. EPA may describe in its CIP SD's responsibilities for community involvement activities. All community involvement activities conducted by SD at EPA's request are subject to EPA's oversight. Upon EPA's request, SD shall establish a community information repository at or near the Site to house one copy of the administrative record.

(c)     **SD's Community Involvement Coordinator**. If requested by EPA, SD shall, within 15 days, designate and notify EPA of SD's Community Involvement Coordinator ("CIC"). SD may hire a contractor for this purpose. SD's notice must include the name, title, and qualifications of SD's CIC. SD's CIC is responsible for providing support regarding EPA's community involvement activities, including coordinating with EPA's CIC regarding responses to the public's inquiries about the Site.

2.2     **SD's Responsibilities for Technical Assistance**

(a)     In addition to community relations activities, if EPA requests, SD shall arrange for a qualified community group to receive the services of a technical advisor(s) who can: (i) help group members understand Site cleanup issues (specifically, to interpret and comment on Site-related documents developed under this SOW); and (ii) share this information with others in the community. The technical advisor(s) will be independent from the SD. SD's TAP assistance will be limited to $50,000, except as provided in ¶ 2.2(c)(3), and will end when EPA issues the Certification of Work Completion under ¶ 4.9. SD shall implement this requirement under a TAP.

(b)     If EPA requests, SD shall, within 30 days, submit a draft TAP for EPA review. EPA will either approve it, disapprove it, or require revisions. If EPA disapproves of or requires revisions to the TAP, SD shall amend and submit to EPA a revised TAP that is responsive to EPA comments within 15 days of receiving EPA comments. Once approved, SD will implement the TAP and EPA will oversee the SD's implementation of the TAP. The TAP must describe the SD's plans for the qualified community group to receive independent technical assistance. The TAP must include the following elements:

(1)     For SD to arrange for publication of a notice in local media that they have received a Letter of Intent ("LOI") to submit an application for a TAP. The notice should explain how other interested groups may also try to

9

combine efforts with the LOI group or submit their own applications, by a reasonable specified deadline;

(2)     For SD to review the application(s) received and determine the eligibility of the community group(s). The proposed TAP must include eligibility criteria as follows:

   (i)      A community group is eligible if it is: (a) comprised of people who are affected by the release or threatened release at the Site, and (b) able to demonstrate its ability to adequately and responsibly manage TAP-related responsibilities.

   (ii)     A community group is ineligible if it is: (a) a potentially responsible party (PRP) at the Site, represents such a PRP, or receives money or services from a PRP (other than through the TAP); (b) affiliated with a national organization; (c) an academic institution; (d) a political subdivision; (e) a tribal government; or (f) a group established or presently sustained by any of the above ineligible entities; or (g) a group in which any of the above ineligible entities is represented.

(3)     For SD to notify EPA of their determination on eligibility of the applicant group(s) to ensure that the determination is consistent with the SOW before notifying the group(s);

(4)     If more than one community group submits a timely application, for SD to review each application and evaluate each application based on the following elements:

   (i)      The extent to which the group is representative of those persons affected by the Site; and

   (ii)     The effectiveness of the group's proposed system for managing TAP-related responsibilities, including its plans for working with its technical advisor and for sharing Site-related information with other members of the community.

(5)     For SD to document their evaluation of, and their selection of, a qualified community group, and to brief EPA regarding their evaluation process and choice. EPA may review SD's evaluation process to determine whether the process satisfactorily follows the criteria in ¶ 2.2(b)(4). TAP assistance may be awarded to only one qualified group at a time;

(6)     For SD to notify all applicant(s) about SD's decision;

(7)     For SD to designate a person (TAP Coordinator) to be their primary contact with the selected community group;

(8)   A description of SD's plans to implement the requirements of ¶ 2.2(c) (Agreement with Selected Community Group); and

(9)   For SD to submit quarterly progress reports regarding the implementation of the TAP.

(c)   **Agreement with Selected Community Group**

(1)   If EPA requests, SD shall negotiate an agreement with the selected community group that specifies the duties of SD and the community group. EPA will review a draft of the agreement and provide comments. The agreement must specify the activities that may be reimbursed under the TAP and the activities that may not be reimbursed under the TAP. The list of allowable activities must be consistent with 40 C.F.R. § 35.4070 (e.g., obtaining the services of an advisor to help the group understand the nature of the environmental and public health hazards at the Site and the various stages of the response action, and communicating Site information to others in the community). The list of non-allowable activities must be consistent with 40 C.F.R. § 35.4075 (e.g., activities related to litigation or political lobbying).

(2)   The agreement must provide that SD's review of the Community Group's recommended choice for Technical Advisor will be limited, consistent with 40 C.F.R. §§ 35.4190 and 35.4195, to criteria such as whether the advisor has relevant knowledge, academic training, and relevant experience as well as the ability to translate technical information into terms the community can understand.

(3)   The agreement must provide that the Community Group is eligible for additional TAP assistance. If the Community Group demonstrates a need for additional TAP assistance, then SD will arrange to provide the additional services or monies needed. EPA will oversee the SD's evaluation of any request by the selected Community Group for additional assistance beyond the $50,000. To be eligible for additional TAP assistance the Community Group must demonstrate that it has effectively managed its TAP responsibilities to date, and that at least three of the following ten factors are satisfied:

(i)   EPA expects that more than eight years (beginning with the initiation of the RI/FS will pass before construction completion will be achieved;

(ii)   EPA requires treatability studies or evaluation of new and innovative technologies;

(iii)   EPA reopens the ROD;

(iv)    The public health assessment (or related activities) for the Site indicates the need for further health investigations and/or health-related activities;

(v)    After SD's selection of the Community Group for the TAP, EPA designates additional operable units at the Site;

(vi)    EPA issues an Explanation of Significant Differences for the ROD;

(vii)    After SD's selection of the Community Group, a legislative or regulatory change results in significant new Site information;

(viii)    Significant public concern about the Site exists, as evidenced, e.g., by relatively large turnout at meetings, the need for multiple meetings, the need for numerous copies of documents to inform community members, etc.;

(ix)    Any other factor that, in EPA's judgment, indicates that the Site is unusually complex; or

(x)    A RI/FS costing at least $2 million was performed at the Site.

(4)    SD is entitled to retain any unobligated TAP funds upon EPA's Certification of Work Completion under ¶ 4.9.

(5)    SD shall submit a draft of the proposed agreement to EPA for its comments.

### 3.    REMEDIAL DESIGN

3.1    **RD Work Plan**. SD shall submit a RD Work Plan ("RDWP") for EPA approval. The RDWP must include:

(a)    Plans for implementing all phases of the RD activities identified in this SOW, in the RDWP, or as required by EPA to be conducted to develop the RD;

(b)    A description of the overall management strategy for performing the RD, including a proposal for phasing of design and construction as described in ¶ 10;

(c)    A description of the proposed general approach to contracting, construction, operation, maintenance, and monitoring of the RA as necessary to implement the Work;

(d)    A description of the responsibility and authority of all organizations and key personnel involved with the development of the RD;

(e)    Descriptions of any areas requiring clarification and/or anticipated problems (e.g., data gaps);

(f)     Description of any proposed pre-design investigation;

(g)     Description of any proposed treatability study (TS);

(h)     Descriptions of any applicable permitting requirements and other regulatory requirements (ARARs); and

(i)     Description of plans for obtaining access in connection with the Work, such as property acquisition, property leases, and/or easements.

3.2    In addition to meetings and communications associated with the phased approach to implementation and RA described in Sections 1.3, 4.3, and 10, SD shall meet regularly with EPA to discuss design issues as necessary, as directed or determined by EPA.

3.3    **Pre-Design Investigation**. The purpose of the Pre-Design Investigation (PDI) for the Ballard Mine Superfund Site is to address data gaps by conducting additional field investigations, including but not limited to field investigations to support design and construction of PRBs and engineered wetlands. Additional PDI will be based on the *Ballard 2018 Work Plan* (Stantec, 2018) and any supplemental PDI Work Plan(s) that may be requested by EPA.

(a)     **PDI Work Plan**. If EPA requests, SD shall submit a PDI Work Plan (PDIWP) for EPA approval. The PDIWP must include:

     (1)     An evaluation and summary of existing data and description of data gaps;

     (2)     A sampling plan including media to be sampled, contaminants or parameters for which sampling will be conducted, location (areal extent and depths), and number of samples; and

     (3)     Cross references, as applicable, to quality assurance/quality control (QA/QC) requirements set forth in the Quality Assurance Project Plan (QAPP) as described in ¶ 6.7(d).

(b)     Following the PDI, SD shall submit a PDI Evaluation Report. This report must include:

     (1)     Summary of the investigations performed;

     (2)     Summary of investigation results;

     (3)     Summary of validated data (i.e., tables and graphics);

     (4)     Data validation reports and laboratory data reports;

     (5)     Narrative interpretation of data and results;

     (6)     Results of statistical and modeling analyses;

(7)    Photographs documenting the work conducted; and

(8)    Conclusions and recommendations for RD, including design parameters and criteria.

(c)    EPA may require SD to supplement the PDI Evaluation Report and/or to perform additional pre-design studies.

### 3.4    Treatability Study

(a)    If requested by EPA, SD shall perform a TS for the purpose to be determined by EPA.

(b)    SD shall submit a TS Work Plan (TSWP) for EPA approval. SD shall prepare the TSWP in accordance with EPA's *Guide for Conducting Treatability Studies under CERCLA, Final* (Oct. 1992), as supplemented for RD by the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995).

(c)    Following completion of the TS, SD shall submit a TS Evaluation Report for EPA comment.

(d)    EPA may require SD to supplement the TS Evaluation Report and/or to perform additional treatability studies.

### 3.5    Preliminary (30%) RD. SD shall submit a Preliminary (30%) RD for EPA's comment. The Preliminary 30% RD will include preliminary design information for all phases of the Ballard RA.

The Preliminary RD must include:

(a)    A basis of design report (BODR) that includes design criteria and other pertinent design considerations, summary of assumptions, and design justification, as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995);

(b)    Preliminary drawings and specifications;

(c)    Descriptions of permit requirements, if applicable;

(d)    A description of how the RA will be implemented in a manner that minimizes environmental impacts in accordance with EPA's *Principles for Greener Cleanups* (Aug. 2009);

(e)    A description of monitoring and control measures to protect human health and the environment, such as air monitoring, dust suppression and stormwater management, during the RA;

(f)      Any proposed revisions to the RA Schedule that is set forth in ¶ 7.3 (RA Schedule); and

3.6    **Pre-Final (90%) RD**. SD shall submit the Pre-final (90%) RD for EPA's comment for each successive phase of design (i.e., Phase 1, Phase 2, and so on). The 90% RD must be a continuation and refinement of the previous design submittal and must address EPA's comments regarding the Preliminary RD and any design modifications that were prepared and implemented during earlier RA construction activities (i.e., earlier phases of construction). For each successive phase of design, the Pre-final RD must include:

(a)      A complete set of construction drawings and specifications that are: (1) certified by a registered professional engineer; (2) suitable for procurement; and (3) follow the Construction Specifications Institute's MasterFormat (2018 Edition).

(b)      A survey and engineering drawings showing existing Site features, such as elements, property borders, easements, and Site conditions;

(c)      Pre-Final versions of the same elements and deliverables as are required for the Preliminary (30%) RD;

(d)      Drafts of all supporting deliverables described in ¶ 6.7 (Supporting Deliverables).

3.7    **Final (100%) RD**. SD shall submit, for each successive phase of the design, the Final (100%) RD for EPA approval. The Final RD must address EPA's comments on the Pre-final RD and must include final versions of all Pre-final RD deliverables.

## 4.      REMEDIAL ACTION

4.1    **RA Work Plan**. SD shall submit a RA Work Plan (RAWP) for EPA approval.  The RAWP will be prepared and approved by EPA prior to Phase 1 construction and updated in successive phases as necessary. The RAWP will include:

(a)      A proposed RA Construction Schedule Gantt chart;

(b)      An updated Health and Safety Plan (HASP) that covers activities during the RA;

(c)      Plans for satisfying permitting requirements, including obtaining permits for off-site activity and for satisfying substantive requirements of permits for on-site activity;

(d)      A specification for photographic documentation of the RA; and

(e)      Copies of all supporting deliverables listed in Section 6.7 (Supporting Deliverables).

4.2    **Independent Quality Assurance Team**. SD shall notify EPA of SD's designated Independent Quality Assurance Team (IQAT). The IQAT will be independent of the Supervising Contractor. SD may hire a third party for this purpose, subject to EPA

approval. SD's notice must include the names, titles, contact information, and qualifications of the members of the IQAT. The IQAT will have the responsibility to determine whether Work is of expected quality and conforms to applicable plans and specifications. The IQAT will have the responsibilities as described in ¶ 2.1.3 of the *Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties*, EPA/540/G-90/001 (Apr. 1990).

4.3     **Meetings, Inspections, and Construction Reports**

(a)     **Preconstruction Conference**. SD shall hold a preconstruction conference with EPA, the State, the Tribes, and others as directed or approved by EPA and as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995). SD shall prepare minutes of the conference and shall distribute the minutes to all Parties.

(b)     **Annual and Periodic Meetings**. During the construction portion of the RA (RA Construction), SD shall meet annually with EPA (following submittal of the Annual Construction Report), the State, the Tribes, and others as directed or determined by EPA, to review progress over the past construction season, discuss plans and design changes for the following year's implementation of the RA. The annual meetings will include review of plans for ore recovery to ensure that any changes in plans for ore recovery do not delay or otherwise impact overall remedy implementation. In addition to the annual meeting, SD shall meet monthly with EPA, the State, the Tribes, and others as directed or determined by EPA, to discuss construction issues. SD shall distribute an agenda and list of attendees to all Parties prior to each meeting. SD shall prepare minutes of the meetings and shall distribute the minutes to all Parties.

(c)     **Inspections**

(1)     EPA or its representative shall conduct annual and periodic inspections of, or have an on-site presence during, the Work. At EPA's request, the Supervising Contractor or other designee shall accompany EPA or its representative during inspections.

(2)     If requested by EPA, SD shall provide on-site office space for EPA personnel to perform their oversight duties, including but not limited to: adequate floor space, an office desk with chair, a file cabinet, and access to reproduction, wireless internet access, and sanitation facilities.

(3)     If requested by EPA, SD shall provide personal protective equipment needed for EPA personnel and any oversight officials to perform their oversight duties.

(4)     Upon notification by EPA of any deficiencies in the RA Construction, SD shall take all necessary steps to correct the deficiencies and/or bring the RA Construction into compliance with the approved Final RD, any approved design changes, and/or the approved RAWP. If applicable, SD

shall comply with any schedule provided by EPA in its notice of
deficiency.

(d)     **Annual Construction Report.** SD shall submit for EPA approval an "Annual
Construction Report" following completion of each year of RA.  The Annual
Construction Report must: (1) describe progress achieved during the previous
year  of remediation; (2) include "as built" drawings signed and stamped by a
registered professional engineer of each remedial component that has been
completed; (3) include records of QA/QC inspections, and engineering field
changes; (4) include statements and supporting documentation that construction
of components that are part of a phase are complete and that the component(s) are
functioning properly and as designed; and (4) include any other pertinent
information related to construction of key components of the remedy completed
during the phase. At the conclusion of the RA, a Construction Completion Report
will be prepared using the Annual Construction Reports to document construction
completion (¶ 4.6 below).

4.4     **Emergency Response and Reporting**

(a)     **Emergency Response and Reporting**. If any event occurs during performance of
the Work that causes or threatens to cause a release of Waste Material on, at, or
from the Site and that either constitutes an emergency situation or that may
present an immediate threat to public health or welfare or the environment, SD
shall: (1) immediately take all appropriate action to prevent, abate, or minimize
such release or threat of release; (2) immediately notify the authorized EPA
officer (as specified in ¶ 4.4(c)) orally; and (3) take such actions in consultation
with the authorized EPA officer and in accordance with all applicable provisions
of the HASP, the Emergency Response Plan (ERP), and any other deliverable
approved by EPA under the SOW. Respondents shall also initiate Idaho's
Hazardous Materials Incident Command and Response Support Plan by calling 1-
800-632-8000.

(b)     **Release Reporting**. Upon the occurrence of any event during performance of the
Work that SD are required to report pursuant to Section 103 of CERCLA,
42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community
Right-to-Know Act (EPCRA), 42 U.S.C. § 11004, SD shall immediately notify
the authorized EPA officer orally.

(c)     The "authorized EPA officer" for purposes of immediate oral notifications and
consultations under ¶ 4.4(a) and ¶ 4.4(b) is the EPA Project Coordinator, the EPA
Alternate Project Coordinator (if the EPA Project Coordinator is unavailable), or
the EPA Emergency Response Unit, Region 10 (if neither EPA Project
Coordinator is available).

(d)     For any event covered by ¶ 4.4(a) and ¶ 4.4(b), SD shall: (1) within 14 days after
the onset of such event, submit a report to EPA describing the actions or events
that occurred and the measures taken, and to be taken, in response thereto; and

17

(2) within 30 days after the conclusion of such event, submit a report to EPA describing all actions taken in response to such event.

(e)    The reporting requirements under ¶ 4.4 are in addition to, and not in lieu of, reporting under Section 103 of CERCLA, 42 U.S.C. § 9603, and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, and any release reporting requirements under state law including, but not limited to, the Idaho Hazardous Waste Management Act, I.C. §39-4401, *et. seq.*, Rules and Standards for Hazardous Waste, IDAPA 58.01.05, and Idaho Water Quality Standards, IDAPA 58.01.02.

## 4.5    Off-Site Shipments

(a)    SD may ship hazardous substances, pollutants, and contaminants from the Site to an off-Site facility only if they comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. SD will be deemed to be in compliance with CERCLA Section 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if SD obtains a prior determination from EPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b).

(b)    SD may ship Waste Material from the Site to an out-of-state waste management facility only if, prior to any shipment, it provides notice to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator. This notice requirement will not apply to any off-Site shipments when the total quantity of all such shipments does not exceed 10 cubic yards. The notice must include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. SD also shall notify the state environmental official referenced above and the EPA Project Coordinator of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility. SD shall provide the notice after the award of the contract for RA construction and before the Waste Material is shipped.

(c)    SD may ship Investigation Derived Waste ("IDW") from the Site to an off-Site facility only if it complies with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), 40 C.F.R. § 300.440, EPA's *Guide to Management of Investigation Derived Waste*, OSWER 9345.3-03FS (Jan. 1992), and any IDW-specific requirements contained in the ROD. Wastes shipped off-Site to a laboratory for characterization, and RCRA hazardous wastes that meet the requirements for an exemption from RCRA under 40 CFR § 261.4(e) shipped off-site for treatability studies, are not subject to 40 C.F.R. § 300.440.

## 4.6    RA Construction Completion (after all phases of construction are complete)

(a)     For purposes of this ¶ 4.6, "RA Construction" comprises, for any RA that involves the construction and operation of a system to achieve Performance Standards (for example, groundwater or surface water restoration remedies), the construction of such system and the performance of all activities necessary for the system to function properly and as designed.

(b)     **Inspection of Constructed Remedy**. SD shall schedule an inspection to review the final construction and operation of the system (after all phases of construction are complete) and to review whether the system is functioning properly and as designed. The inspection must be attended by SD and EPA and/or their representatives. A re-inspection must be conducted if requested by EPA.

(c)     **Shakedown Period**. There shall be a shakedown period of up to one year for EPA to review whether the remedy is functioning properly and performing as designed. SD shall provide such information as EPA requests for such review.

(d)     **RA Construction Completion Report**. Following the shakedown period, SD shall submit an RA Construction Completion Report (RA CCR) requesting EPA's determination that RA Construction has been completed. An RA CCR will be prepared using the Annual Construction Reports to document construction completion (¶ 4.3(d) above). The RA CCR must: (1) include statements by a registered professional engineer and by SD's Project Coordinator that construction of the system is complete and that the system is functioning properly and as designed; (2) include a demonstration, and supporting documentation, that construction of the system is complete and that the system is functioning properly and as designed; (3) include as-built drawings signed and stamped by a registered professional engineer; (4) be prepared in accordance with Chapter 2 (Remedial Action Completion) of EPA's *Close Out Procedures for NPL Sites* guidance (May 2011), as supplemented by *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017); and (5) be certified in accordance with ¶ 6.5 (Certification).

(e)     If EPA determines that RA Construction is not complete, EPA shall so notify SD. EPA's notice must include a description of, and schedule for, the activities that SD must perform to complete RA Construction. EPA's notice may include a schedule for completion of such activities or may require SD to submit a proposed schedule for EPA approval. SD shall perform all activities described in the EPA notice in accordance with the schedule.

(f)     If EPA determines, based on the initial or any subsequent RA Report, that RA Construction is complete, EPA shall so notify SD.

**4.7     Certification of RA Completion**

(a)     **Monitoring Report**. SD shall submit a Monitoring Report to EPA requesting EPA's Certification of RA Completion. The report must: (1) include certifications by a registered professional engineer and by SD's Project Coordinator that the RA

is complete; (2) be prepared in accordance with Chapter 2 (Remedial Action Completion) of EPA's *Close Out Procedures for NPL Sites* guidance (May 2011), as supplemented by *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017); (3) contain monitoring data to demonstrate that Performance Standards have been achieved; and (4) be certified in accordance with ¶ 6.5 (Certification).

(b)     If EPA concludes that the RA is not Complete, EPA shall so notify SD. EPA's notice must include a description of any deficiencies. EPA's notice may include a schedule for addressing such deficiencies or may require SD to submit a schedule for EPA approval. SD shall perform all activities described in the notice in accordance with the schedule.

(c)     If EPA concludes, based on the initial or any subsequent RA Monitoring Report requesting Certification of RA Completion, that the RA is Complete, EPA shall so certify to SD. Certification of RA Completion will not affect SD's remaining obligations under the CD.

4.8     **Periodic Review Support Plan**. SD shall submit the Periodic Review Support Plan (PRSP) for EPA approval. The PRSP addresses the studies and investigations that SD shall conduct to support EPA's reviews of whether the RA is protective of human health and the environment in accordance with Section 121(c) of CERCLA, 42 U.S.C. § 9621(c) (also known as Five-year Reviews or FYRs). SD shall develop the plan in accordance with *Comprehensive Five-year Review Guidance*, OSWER 9355.7-03B-P (June 2001), and any other relevant FYR guidances. During the FYR, O&M data will be reviewed to determine if the RA is complete as evidenced by the attainment of Performance Standards. Once the Performance Standards have been attained, Paragraph 4.7 will be performed.

4.9     **Certification of Work Completion**

(a)     **Work Completion Inspection**. SD shall schedule an inspection for the purpose of obtaining EPA's Notice of Work Completion. The inspection must be attended by SD and EPA and/or their representatives.

(b)     **Work Completion Report**. Following the inspection, SD shall submit a report to EPA requesting EPA's Certification of Work Completion. The report must: (1) include certifications by a registered professional engineer and by SD's Project Coordinator that the Work, including all O&M activities, is complete; and (2) be certified in accordance with ¶ 6.5 (Certification). If the Monitoring Report submitted under ¶ 4.7(a) includes all elements required under this ¶ 4.9(b), then the Monitoring Report suffices to satisfy all requirements under this ¶ 4.9(b).

(c)     If EPA concludes that the Work is not complete, EPA shall so notify SD. EPA's notice must include a description of the activities that SD must perform to complete the Work. EPA's notice must include specifications and a schedule for such activities or must require SD to submit specifications and a schedule for

EPA approval. SD shall perform all activities described in the notice or in the EPA-approved specifications and schedule.

(d)     If EPA concludes, based on the initial or any subsequent report requesting Certification of Work Completion, that the Work is complete, EPA shall so certify in writing to SD. Issuance of the Certification of Work Completion does not affect the following continuing obligations: (1) activities under the Periodic Review Support Plan; (2) obligations under Sections VIII (Property Requirements), XVIII (Access to Information), and XIX (Retention of Records), of the CD; (3) IC obligations as provided in the Institutional Controls Implementation and Assurance Plan (ICIAP); (4) activities under the Adaptive Management Plan; and (5) reimbursement of EPA's Future Response Costs under Section X (Payments for Response Costs) of the CD.

## 5.     REPORTING

5.1     **Progress Reports**. Commencing with the month following lodging of the CD and until EPA approves the RA CCR, SD shall submit progress reports to EPA on a monthly basis, or as otherwise requested by EPA, with copies to the State and the Tribes. The reports must cover all activities that took place during the prior reporting period, including:

(a)     The actions that have been taken toward achieving compliance with the CD;

(b)     A summary of all results of sampling, tests, and all other data received or generated by SD;

(c)     A description of all deliverables that SD submitted to EPA;

(d)     A description of all activities relating to RA Construction that are scheduled for the next six weeks;

(e)     An updated RA Construction Schedule (updated prior to the beginning of each field season), together with information regarding percentage of completion, delays encountered or anticipated that may affect the future schedule for implementation of the Work, and a description of efforts made to mitigate those delays or anticipated delays;

(f)     A description of any modifications to the work plans or other schedules that SD has proposed or that have been approved by EPA; and

(g)     A description of all activities undertaken in support of the CIP during the reporting period and those to be undertaken in the next six weeks.

5.2     **Notice of Progress Report Schedule Changes**. If the schedule for any activity described in the Progress Reports, including activities required to be described under ¶ 5.1(d), changes, SD shall notify EPA, the State, and the Tribes of such change at least seven days before performance of the activity.

# 6.     DELIVERABLES

6.1     **Applicability**. SD shall submit deliverables for EPA approval or for EPA comment as specified in the SOW. If neither is specified, the deliverable does not require EPA's approval or comment. Paragraphs 6.2 (In Writing) through 6.4 (Technical Specifications) apply to all deliverables. Paragraph 6.5 (Certification) applies to any deliverable that is required to be certified. Paragraph 6.6 (Approval of Deliverables) applies to any deliverable that is required to be submitted for EPA approval.

6.2     **In Writing**. As provided in ¶ 84 of the CD, all deliverables under this SOW must be in writing unless otherwise specified.

6.3     **General Requirements for Deliverables**. All deliverables must be submitted by the deadlines in the RD Schedule or RA Schedule, as applicable. SD shall submit all deliverables to EPA in electronic form. Technical specifications for sampling and monitoring data and spatial data are addressed in ¶ 6.4. All other deliverables shall be submitted to EPA in the electronic form specified by the EPA RPM. If any deliverable includes maps, drawings, or other exhibits that are larger than 8.5" by 11", SD shall also provide EPA with paper copies of such exhibits, if requested by EPA.

6.4     **Technical Specifications for Data Management**

(a)     Sampling and monitoring data should be submitted in standard Regional Electronic Data Deliverable (EDD) format. Other delivery methods may be allowed (for example, in the form of a Data Summary Report) if electronic direct submission presents a significant burden or as technology changes.

(b)     Spatial data, including spatially-referenced data and geospatial data, should be submitted: (1) in the ESRI File Geodatabase format; and (2) as unprojected geographic coordinates in decimal degree format using North American Datum 1983 (NAD83) or World Geodetic System 1984 (WGS84) as the datum. If applicable, submissions should include the collection method(s). Projected coordinates may optionally be included but must be documented. Spatial data should be accompanied by metadata, and such metadata should be compliant with the Federal Geographic Data Committee (FGDC) Content Standard for Digital Geospatial Metadata and its EPA profile, the EPA Geospatial Metadata Technical Specification. An add-on metadata editor for ESRI software, the EPA Metadata Editor (EME), complies with these FGDC and EPA metadata requirements and is available at https://www.epa.gov/geospatial/epa-metadata-editor.

(c)     Each file must include an attribute name for each site unit or sub-unit submitted. Consult http://www.epa.gov/geospatial/geospatial-policies-and-standards for any further available guidance on attribute identification and naming.

(d)     Spatial data submitted by SD does not, and is not intended to, define the boundaries of the Site.

6.5     **Certification**. All deliverables that require compliance with this ¶ 6.5 must be signed by SD's Project Coordinator, or other responsible official of SD, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

6.6     **Approval of Deliverables**

(a)     **Initial Submissions**

(1)     After review of any deliverable that is required to be submitted for EPA approval under the CD or the SOW, EPA shall: (i) approve, in whole or in part, the submission; (ii) approve the submission upon specified conditions; (iii) disapprove, in whole or in part, the submission; or (iv) any combination of the foregoing. EPA may choose to submit comments to the SD to address before issuing approval or disapproval of any submission.

(2)     EPA also may modify the initial submission to cure deficiencies in the submission if: (i) EPA determines that disapproving the submission and awaiting a resubmission would cause substantial disruption to the Work; or (ii) previous submission(s) have been disapproved due to material defects and the deficiencies in the initial submission under consideration indicate a bad faith lack of effort to submit an acceptable deliverable.

(b)     **Resubmissions**. Upon receipt of a notice of disapproval under ¶ 6.6(a) (Initial Submissions), or if required by a notice of approval upon specified conditions under ¶ 6.6(a), SD shall, within 30 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the deliverable for approval. After review of the resubmitted deliverable, EPA may: (1) approve, in whole or in part, the resubmission; (2) approve the resubmission upon specified conditions; (3) modify the resubmission; (4) disapprove, in whole or in part, the resubmission, requiring SD to correct the deficiencies; or (5) any combination of the foregoing.

(c)     **Implementation**. Upon approval, approval upon conditions, or modification by EPA under ¶ 6.6(a) (Initial Submissions) or ¶ 6.6(b) (Resubmissions), of any deliverable, or any portion thereof: (1) such deliverable, or portion thereof, will be incorporated into and enforceable under the CD; and (2) SD shall take any action

23

required by such deliverable, or portion thereof. The implementation of any non-deficient portion of a deliverable submitted or resubmitted under ¶ 6.6(a) or ¶ 6.6(b) does not relieve SD of any liability for stipulated penalties under Section XIV (Stipulated Penalties) of the CD.

6.7     **Supporting Deliverables**. SD shall submit each of the following supporting deliverables for EPA approval, except as specifically provided otherwise. SD shall develop the deliverables in accordance with all applicable regulations, guidances, and policies (see Section 9 (References)). SD shall update each of these supporting deliverables as necessary or appropriate during the course of the Work, and/or as requested by EPA.

(a)     **Health and Safety Plan**. The HASP describes all activities to be performed to protect on site personnel and area residents from physical, chemical, and all other hazards posed by the Work. SD shall develop the HASP in accordance with EPA's Emergency Responder Health and Safety and Occupational Safety and Health Administration (OSHA) requirements under 29 C.F.R. §§ 1910 and 1926. The HASP should cover RD activities and should be, as appropriate, updated to cover activities during the RA and updated to cover activities after RA completion. EPA does not approve the HASP, but will review it to ensure that all necessary elements are included and that the plan provides for the protection of human health and the environment.

(b)     **Emergency Response Plan**. The ERP must describe procedures to be used in the event of an accident or emergency at the Site (for example, power outages, water impoundment failure, treatment plant failure, slope failure, etc.). The ERP must include:

(1)     Name of the person or entity responsible for responding in the event of an emergency incident;

(2)     Plan and date(s) for meeting(s) with the local community, including local, State, and federal agencies involved in the cleanup, as well as local emergency squads and hospitals;

(3)     Spill Prevention, Control, and Countermeasures (SPCC) Plan (if applicable), consistent with the regulations under 40 C.F.R. Part 112, describing measures to prevent, and contingency plans for, spills and discharges;

(4)     Notification activities in accordance with ¶ 4.4(b) (Release Reporting) in the event of a release of hazardous substances requiring reporting under Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of EPCRA, 42 U.S.C. § 11004 or releases requiring reporting under state law including, but not limited to, the Idaho Hazardous Waste Management Act, I.C. §39-4401, *et. seq.*, Rules and Standards for Hazardous Waste, IDAPA 58.01.05, and Idaho Water Quality Standards, IDAPA 58.01.02; and

(5)     A description of all necessary actions to ensure compliance with Paragraph 11 (Emergencies and Releases) of the CD in the event of an occurrence during the performance of the Work that causes or threatens a release of Waste Material from the Site that constitutes an emergency or may present an immediate threat to public health or welfare or the environment.

(c)     **Field Sampling Plan**. The Field Sampling Plan (FSP) addresses groundwater, surface water, sediment, riparian soil, vegetation, and upland soil sample collection activities. The FSP must be written so that a field sampling team unfamiliar with the project would be able to gather the samples and field information required. SD shall develop the FSP in accordance with *Guidance for Conducting Remedial Investigations and Feasibility Studies*, EPA/540/G 89/004 (Oct. 1988).

(d)     **Quality Assurance Project Plan**. The QAPP augments the FSP and addresses all sample analysis and data handling regarding the Work. The QAPP must include a detailed explanation of SD's quality assurance, quality control, and chain of custody procedures for all treatability, design, compliance, and monitoring samples. SD shall develop the QAPP in accordance with *EPA Requirements for Quality Assurance Project Plans*, QA/R-5, EPA/240/B-01/003 (Mar. 2001, reissued May 2006); *Guidance for Quality Assurance Project Plans*, QA/G-5, EPA/240/R 02/009 (Dec. 2002); and *Uniform Federal Policy for Quality Assurance Project Plans*, Parts 1-3, EPA/505/B-04/900A though 900C (Mar. 2005). The QAPP also must include procedures:

(1)     To ensure that EPA, the State, and their authorized representatives have reasonable access to laboratories used by SD in implementing the CD (SD's Labs);

(2)     To ensure that SD's Labs analyze all samples submitted by EPA pursuant to the QAPP for quality assurance monitoring;

(3)     To ensure that SD's Labs perform all analyses using EPA-accepted methods (i.e., the methods documented in *USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis*, ILM05.4 (Dec. 2006); *USEPA Contract Laboratory Program Statement of Work for Organic Analysis*, SOM01.2 (amended Apr. 2007); and *USEPA Contract Laboratory Program Statement of Work for Inorganic Superfund Methods (Multi-Media, Multi-Concentration)*, ISM01.2 (Jan. 2010)) or other methods acceptable to EPA;

(4)     To ensure that SD's Labs participate in an EPA-accepted QA/QC program or other program QA/QC acceptable to EPA;

(5)     For SD to provide EPA and the State with notice at least 14 days prior to any sample collection activity;

(6) For SD to provide split samples and/or duplicate samples to EPA and the State upon request;

(7) For EPA and the State to take any additional samples that they deem necessary;

(8) For EPA and the State to provide to SD, upon request, split samples and/or duplicate samples in connection with EPA's and the State's oversight sampling; and

(9) For SD to submit to EPA, the State, and the Tribes all sampling and tests results and other data in connection with the implementation of the CD.

(e) **OU1 Long-Term Monitoring Plan**. The purpose of the OU1 Long-Term Monitoring Plan ("OU1 MP") is to obtain information, through short- and long-term monitoring, about the movement of and changes in contamination throughout the Site, before and during implementation of the RA; to obtain information regarding contamination levels to determine whether Performance Standards are achieved; and to obtain information to determine whether to perform additional actions, including further Site monitoring. The OU1 MP must include:

(1) Description of the environmental media to be monitored;

(2) Description of the data collection parameters, including existing and proposed monitoring devices and locations, schedule and frequency of monitoring, analytical parameters to be monitored, and analytical methods employed;

(3) Description of how performance data will be analyzed, interpreted, and reported, and/or other Site-related requirements;

(4) Description of verification sampling procedures;

(5) Description of deliverables that will be generated in connection with monitoring, including sampling schedules, laboratory records, monitoring reports, and monthly and annual reports to EPA, State, and Tribal agencies; and

(6) Description of proposed additional monitoring and data collection actions (such as increases in frequency of monitoring, and/or installation of additional monitoring devices in the affected areas) in the event that results from monitoring devices indicate changed conditions (such as higher than expected concentrations of the contaminants of concern or groundwater contaminant plume movement).

(f) **Construction Quality Assurance/Quality Control Plan (CQA/QCP)**. The purpose of the Construction Quality Assurance Plan (CQAP) is to describe

26

planned and systemic activities that provide confidence that the RA construction will satisfy all plans, specifications, and related requirements, including quality objectives. The purpose of the Construction Quality Control Plan (CQCP) is to describe the activities to verify that RA construction has satisfied all plans, specifications, and related requirements, including quality objectives. The CQA/QCP must:

(1)     Identify, and describe the responsibilities of, the organizations and personnel implementing the CQA/QCP;

(2)     Describe the PS required to be met to achieve Completion of the RA;

(3)     Describe the activities to be performed: (i) to provide confidence that PS will be met; and (ii) to determine whether PS have been met;

(4)     Describe verification activities, such as inspections, sampling, testing, monitoring, and production controls, under the CQA/QCP;

(5)     Describe industry standards and technical specifications used in implementing the CQA/QCP;

(6)     Describe procedures for tracking construction deficiencies from identification through corrective action;

(7)     Describe procedures for documenting all CQA/QCP activities; and

(8)     Describe procedures for retention of documents and for final storage of documents.

(g)     **Transportation and Off-Site Disposal Plan**. If requested by EPA, SD shall provide a Transportation and Off-Site Disposal Plan ("TODP") that describes plans to ensure compliance with ¶ 4.5 (Off-Site Shipments). The TODP must include:

(1)     Proposed routes for off-site shipment of Waste Material;

(2)     Identification of communities affected by shipment of Waste Material; and

(3)     Description of plans to minimize impacts on affected communities.

(h)     **O&M Plan**. The O&M Plan describes the requirements for inspecting, operating, and maintaining the components built during the RA. SD shall develop the O&M Plan in accordance with *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017). The O&M Plan must include the following additional requirements:

(1)     Description of Performance Standards required to be met to implement the ROD;

27

(2)     Description of activities to be performed: (i) to provide confidence that Performance Standards will be met; and (ii) to determine whether Performance Standards have been met;

(3)     **O&M Reporting**. Description of records and reports that will be generated during O&M, such as daily operating logs, laboratory records, records of operating costs, reports regarding emergencies, personnel and maintenance records, monitoring reports, and monthly and annual reports to EPA, State, and Tribal agencies;

(4)     Description of corrective action in case of systems failure, including: (i) alternative procedures to prevent the release or threatened release of Waste Material which may endanger public health and the environment or may cause a failure to achieve Performance Standards; (ii) analysis of vulnerability and additional resource requirements should a failure occur; (iii) notification and reporting requirements should O&M systems fail or be in danger of imminent failure; and (iv) community notification requirements; and

(5)     Description of corrective action to be implemented in the event that Performance Standards are not achieved; and a schedule for implementing these corrective actions.

(i)     **O&M Manual**. The O&M Manual serves as a guide to the purpose and function of the equipment and systems that make up the remedy. SD shall develop the O&M Manual in accordance with *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017). The O&M Manual will be developed after the remedy component has been constructed (e.g., an engineered wetlands) and the component has gone through an initial shakedown to be sure that it is operating satisfactorily.  The SD will prepare the O&M Manual and the document will be used by future operators of the system.

(j)     **Stormwater Pollution Prevention Plan**. A master Stormwater Pollution Prevention Plan (SWPPP) will be prepared to guide the development of the construction SWPPP for implementation during the RA construction. A Construction SWPPP will be develop by the selected contractor using the master SWPPP for management of stormwater during construction.

(k)     **Adaptive Management Plan**.  The Adaptive Management Plan (AMP) will describe the process for making management decisions for elements of the remedy with significant uncertainty or vulnerability regarding performance. The adaptive management plan will include the following elements:

(1)     Problem statement, including a description of vulnerabilities, uncertainties, and potential consequences associated with key components of the remedy;

28

(2)  Monitoring strategy that includes specific indicators and describes the type, amount, and quality of information needed to make management decisions;

(3)  Performance thresholds for initiating follow-up actions, including cleanup levels, and performance goals and specifications; and

(4)  Potential management actions and responses to address unanticipated monitoring results or conditions. These may include additional designs, design modifications, or operational changes to optimize the performance of remedy components, correct design oversights or construction defects, or take other actions necessary to achieve intended remedial outcomes.

Follow-up actions and modifications made through the adaptive management process would not constitute a significant or fundamental change to the Selected Remedy.

(l)  **Institutional Controls Implementation and Assurance Plan**. The ICIAP describes plans to implement, maintain, and enforce the ICs at the Site. SD shall develop the ICIAP in accordance with *Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites*, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012), and *Institutional Controls: A Guide to Preparing Institutional Controls Implementation and Assurance Plans at Contaminated Sites*, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012). The ICIAP must include the following additional requirements:

(1)  Locations of recorded real property interests (e.g., easements and liens) and resource interests in the property that may affect ICs (e.g., surface, mineral, and water rights), including accurate mapping and geographic information system (GIS) coordinates of such interests; and

(2)  Legal descriptions and survey maps that are prepared according to current American Land Title Association (ALTA) survey guidelines and certified by a licensed surveyor.

(3)  Institutional controls, by media, as follows:

**Groundwater** (alluvial, intermediate, and regional aquifers):  Government and Proprietary controls in the form of State and/or County restrictions on drilling and well installation in specified areas to restrict future wells. In areas with defined alluvial GW plumes on the east and west side of the site, ICs should restrict the use of existing wells for potable water supply and irrigation of gardens until CLs are met (health risk – ingestion). ICs should restrict the drilling of new wells for potable use and irrigation of gardens within, proximal to, or immediately downgradient of existing plumes until CLs are met (health risk – ingestion).

29

**Surface Water** (runoff, intermittent/ephemeral streams, springs, seeps, ponds):  Government and Proprietary Controls, such as deed restrictions, and restrictive environmental covenants for private property, road closures utilizing fencing, locked gates, and signage will be installed to deny public access to all on-site runoff channels, streams, springs, seeps, and ponds.

Contaminated runoff, spring, and seep water onsite or originating from the site will be captured and directed to a remedial feature (retention pond, PRB, wetland bioreactor) to remove sediment and treat contaminants before releasing off site. Use of this water for potable and irrigation purposes is prohibited until CLs are met (Health risk – incidental ingestion, plant uptake, livestock uptake).

**Riparian Zones** (along perennial, intermittent, and ephemeral channels): Government and Proprietary controls in the form of zoning for State and/or County land, deed restrictions and restrictive environmental covenants for private property to restrict and limit human access and building in these areas.

In riparian corridors formed along intermittent stream channels originating from the site appropriate ICs shall be implemented to address the potential risks. Access to riparian corridors is to be restricted by road closure or signage until CLs are met. (Health Risk – incidental ingestion, plant uptake, livestock uptake)

**Soil and Waste Rock** (ET cover):  Government and Proprietary controls in the form of road closures, zoning, and restrictive environmental covenants to prevent access and new construction within the remediated site. LUCs will be implemented where applicable (fencing, locked gates, signage, etc). Advisory information describing phase of remedial construction, location of the work, schedule, and land closure will be distributed to the public.

Applicable to the ET Cover across the site, physical access by public vehicles of any kind (including dirt bikes and off-road recreational vehicles) is prohibited (Health risk – incidental ingestion).

Residential construction and occupancy are prohibited (Health risk – incidental ingestion, including cultural plant ingestion).

Long term livestock grazing is prohibited until remedial construction is complete, functional, and operational (Health risk – plant uptake, livestock ingestion).

## 7.    SCHEDULES

7.1    **Applicability and Revisions**. All deliverables and tasks required under this SOW must be submitted or completed by the deadlines or within the time durations listed in the

RD/RA Schedules set forth below. SD may submit proposed revised RD/RA Schedules for EPA approval (for example in the RDWP and at major milestones).  Upon EPA's approval, the revised RD/RA schedules supersede the RD/RA Schedules set forth below, and any previously approved versions of the RD/RA Schedules.

## 7.2   RD Schedule

|   | Description of Deliverable, Task | ¶ Ref. | Deadline |
|---|---|---|---|
| 1 | TAP | 2.2(b) | 30 days after EPA request |
| 2 | Designate TAP Coordinator | 2.2(b)(7) | 30 days after EPA request |
| 3 | RDWP | 3.1 | Draft - (60) days after (i) authorization to proceed or (ii) effective date of the Consent Decree, whichever is later; Final - (45) days after receipt of EPA comments on Draft RD Work Plan. |
| 4 | PDIWP | 3.3(a) | 60 days after EPA request. |
| 5 | Preliminary (30%) RD | 3.5, 3.3(a) | 90 days after EPA approval of Final RDWP |
| 6 | Pre-final (90%) RD | 3.6 | For Phase 1, 90 days after EPA approval of the Preliminary (30%) RD.  For successive phases, as specified in approved RDWP schedule |
| 7 | Final (100%) RD | 3.73.6(d) | For Phase 1 and successive phases, 60 days after EPA approval of Pre-final (90%) RD |

7.3     **RA Schedule**

| | Description of Deliverable / Task | ¶ Ref. | Deadline |
|---|---|---|---|
| 1 | Award RA contract to Construction Contractor | | 60 days after EPA Approval of Final (100%) RD |
| 2 | Draft RAWP | 4.1 | 30 days after EPA Approval of Final (100%) RD |
| 3 | Designate IQAT | 4.2 | 30 days after Award of RA contract |
| 4 | Pre-Construction Conference | 4.3(a) | 30 days after EPA Approval of Final RAWP |
| 5 | Start of Construction | | 60 days after EPA Approval of RAWP, or as soon as weather allows if approved during the winter season. |
| 6 | Annual Construction Report | 4.3(d) | January 15, following each year of RA construction. |
| 7 | Completion of Construction | | 10 years after start of construction or as modified by the approved RA schedule |
| 8 | Pre-final Inspection | 4.6(b) | 60 days after completion of construction |
| 9 | Pre-final Inspection Report | 4.6(d) | 60 days after completion of Pre-final Inspection |
| 10 | Final Inspection | | 30 days after Completion of Work identified in Pre-final Inspection Report |
| 11 | RA Construction Completion Report | 4.6(d) | 60 days after Final Inspection |
| 12 | Monitoring Report | 4.7(a) | 90 days after demonstration that Performance Standards have been achieved, as documented in Periodic Review Support Plan. |
| 13 | Work Completion Report | 4.9(b) | 90 days after work completion inspection conducted pursuant to paragraph 4.9(a) |
| 14 | Periodic Review Support Plan | 4.8 | Five years after Start of RA Construction, and every five years thereafter. |

## 8.     STATE AND TRIBAL PARTICIPATION

8.1     **Copies**. SD shall, at any time they send a deliverable to EPA, send a copy of such deliverable to the State and the Tribes. EPA shall, at any time it sends a notice, authorization, approval, disapproval, or certification to SD, send a copy of such document to the State and the Tribes.

8.2     **Review and Comment**. The State and the Tribes will have a reasonable opportunity for review and comment prior to:

(a)     Any EPA approval or disapproval under ¶ 6.6 (Approval of Deliverables) of any deliverables that are required to be submitted for EPA approval;

(b)     Any approval or disapproval of the Construction Phase under ¶ 4.6 (RA Construction Completion), and any disapproval of, or Certification of RA Completion under ¶ 4.7 (Certification of RA Completion), and any disapproval of, or Certification of Work Completion under ¶ 4.9 (Certification of Work Completion); and

(c)     For submitted documents, the EPA RPM will provide by email, to the support agencies a review timeframe between fourteen days and forty-five days, depending on the breadth of the document under review and whether the document has been previously reviewed.

8.3     **Participation in Meetings, Conferences and Inspections.**  The State and the Tribes will have a reasonable opportunity to participate in meetings, conferences, and annual and periodic inspections that are required under ¶¶ 4.3(c), 4.6(b), and 4.9(a).

## 9.     REFERENCES

9.1     The following regulations and guidance documents, among others, apply to the Work. Any item for which a specific URL is not provided below is available on one of the two EPA Web pages listed in ¶ 9.2:

(a)     A Compendium of Superfund Field Operations Methods, OSWER 9355.0-14, EPA/540/P-87/001a (Aug. 1987).

(b)     CERCLA Compliance with Other Laws Manual, Part I: Interim Final, OSWER 9234.1-01, EPA/540/G-89/006 (Aug. 1988).

(c)     Guidance for Conducting Remedial Investigations and Feasibility Studies, OSWER 9355.3-01, EPA/540/G-89/004 (Oct. 1988).

(d)     CERCLA Compliance with Other Laws Manual, Part II, OSWER 9234.1-02, EPA/540/G-89/009 (Aug. 1989).

(e)     Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER 9355.5-01, EPA/540/G-90/001 (Apr.1990).

(f)     Guidance on Expediting Remedial Design and Remedial Actions, OSWER 9355.5-02, EPA/540/G-90/006 (Aug. 1990).

(g)     Guide to Management of Investigation-Derived Wastes, OSWER 9345.3-03FS (Jan. 1992).

(h)     Permits and Permit Equivalency Processes for CERCLA On-Site Response Actions, OSWER 9355.7-03 (Feb. 1992).

(i)     Guidance for Conducting Treatability Studies under CERCLA, OSWER 9380.3-10, EPA/540/R-92/071A (Nov. 1992).

(j)     National Oil and Hazardous Substances Pollution Contingency Plan; Final Rule, 40 C.F.R. Part 300 (Oct. 1994).

(k)     Guidance for Scoping the Remedial Design, OSWER 9355.0-43, EPA/540/R-95/025 (Mar. 1995).

(l)     Remedial Design/Remedial Action Handbook, OSWER 9355.0-04B, EPA/540/R-95/059 (June 1995).

(m)     EPA Guidance for Data Quality Assessment, Practical Methods for Data Analysis, QA/G-9, EPA/600/R-96/084 (July 2000).

(n)     Comprehensive Five-year Review Guidance, OSWER 9355.7-03B-P, 540-R-01-007 (June 2001).

(o)     Guidance for Quality Assurance Project Plans, QA/G-5, EPA/240/R-02/009 (Dec. 2002).

(p)     Institutional Controls: Third Party Beneficiary Rights in Proprietary Controls (Apr. 2004).

(q)     Quality management systems for environmental information and technology programs - Requirements with guidance for use, ASQ/ANSI E4:2014 (American Society for Quality, February 2014).

(r)     Uniform Federal Policy for Quality Assurance Project Plans, Parts 1-3, EPA/505/B-04/900A though 900C (Mar. 2005).

(s)     Superfund Community Involvement Handbook, SEMS 100000070 (January 2016). http://www.epa.gov/superfund/community-involvement-tools-and-resources.

(t)     EPA Guidance on Systematic Planning Using the Data Quality Objectives Process, QA/G-4, EPA/240/B-06/001 (Feb. 2006).

(u)     EPA Requirements for Quality Assurance Project Plans, QA/R-5, EPA/240/B-01/003 (Mar. 2001, reissued May 2006).

(v)     EPA Requirements for Quality Management Plans, QA/R-2, EPA/240/B-01/002 (Mar. 2001, reissued May 2006).

(w)     USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis, ILM05.4 (Dec. 2006).

(x)     USEPA Contract Laboratory Program Statement of Work for Organic Analysis, SOM01.2 (amended Apr. 2007).

(y)     EPA National Geospatial Data Policy, CIO Policy Transmittal 05-002
        (Aug. 2008), http://www.epa.gov/geospatial/geospatial-policies-and-standards
        and http://www.epa.gov/geospatial/epa-national-geospatial-data-policy.

(z)     Summary of Key Existing EPA CERCLA Policies for Groundwater Restoration,
        OSWER 9283.1-33 (June 2009).

(aa)    Principles for Greener Cleanups (Aug. 2009),
        http://www.epa.gov/greenercleanups/epa-principles-greener-cleanups.

(bb)    Providing Communities with Opportunities for Independent Technical Assistance
        in Superfund Settlements, Interim (Sep. 2009).]

(cc)    USEPA Contract Laboratory Program Statement of Work for Inorganic
        Superfund Methods (Multi-Media, Multi-Concentration), ISM01.2 (Jan. 2010).

(dd)    Close Out Procedures for National Priorities List Sites, OSWER 9320.2-22
        (May 2011).

(ee)    Groundwater Road Map: Recommended Process for Restoring Contaminated
        Groundwater at Superfund Sites, OSWER 9283.1-34 (July 2011).

(ff)    Recommended Evaluation of Institutional Controls: Supplement to the
        "Comprehensive Five-Year Review Guidance," OSWER 9355.7-18 (Sep. 2011).

(gg)    Construction Specifications Institute's MasterFormat [**specify current edition**],
        available from the Construction Specifications Institute,
        https://www.csiresources.org/home.

(hh)    Updated Superfund Response and Settlement Approach for Sites Using the
        Superfund Alternative Approach, OSWER 9200.2-125 (Sep. 2012)

(ii)    Institutional Controls: A Guide to Planning, Implementing, Maintaining, and
        Enforcing Institutional Controls at Contaminated Sites, OSWER 9355.0-89,
        EPA/540/R-09/001 (Dec. 2012).

(jj)    Institutional Controls: A Guide to Preparing Institutional Controls Implementation
        and Assurance Plans at Contaminated Sites, OSWER 9200.0-77, EPA/540/R-
        09/02 (Dec. 2012).

(kk)    EPA's Emergency Responder Health and Safety Manual, OSWER 9285.3-12
        (July 2005 and updates), http://www.epaosc.org/_HealthSafetyManual/manual-
        index.htm

(ll)    Broader Application of Remedial Design and Remedial Action Pilot Project
        Lessons Learned, OSWER 9200.2-129 (Feb. 2013).

(mm)   Guidance for Evaluating Completion of Groundwater Restoration Remedial Actions, OSWER 9355.0-129 (Nov. 2013).

(nn)   Groundwater Remedy Completion Strategy: Moving Forward with the End in Mind, OSWER 9200.2-144 (May 2014).

(oo)   Guidance for Management of Superfund Remedies in Post Construction, OLEM 9200.3-105 (Feb. 2017), https://www.epa.gov/superfund/superfund-post-construction-completion.

9.2   A more complete list may be found on the following EPA Web pages:

Laws, Policy, and Guidance: http://www.epa.gov/superfund/superfund-policy-guidance-and-laws

Test Methods Collections: http://www.epa.gov/measurements/collection-methods

9.3   For any regulation or guidance referenced in the CD or SOW, the reference will be read to include any subsequent modification, amendment, or replacement of such regulation or guidance. Such modifications, amendments, or replacements apply to the Work only after SDs receive notification from EPA of the modification, amendment, or replacement.

## 10.   CONSTRUCTION PHASES

10.1   The Selected Remedy for each of the contaminated media will be sequenced in two main phases (Phases 1 and 2), with the final remedy implementation (as measured by installation of the cover system) progressing generally from the east side of the Site, to the central Site areas, and finally to the west side of the Site. The RA construction phasing shown in Table 10.1 is based on a conceptual approach using current Site information regarding the location and quantity of waste rock, cover materials, etc. During the RD process and the RA construction, phasing of ore recovery and remedial activities listed in Table 10.1 might be modified to optimize implementation of the remedy based on new information available at that time, provided that these modifications would not fundamentally change the remedy components or the ability to achieve the RAOs. Under the phased design and construction approach, there will be submittal of annual construction reports, and annual meetings to discuss the past year's construction accomplishments, plans for the following year's construction activities, and any design changes or adaptive management strategies that are necessary as discussed in this SOW.

**Table 10.1 – Ballard Mine Summary of RA Phases**

| Phases | RA Mine Pit/Waste Rock Dump Status by Phases |
|---|---|
| Phase 1 | |
| Phase 1a | • Site Access Roads |

**Table 10.1 – Ballard Mine Summary of RA Phases**

| Phases | RA Mine Pit/Waste Rock Dump Status by Phases |
|---|---|
|  | • Drainage/Sediment Controls<br>• Borrow Development<br>• Grading of SE Waste Rock Dump (MWD082)<br>• Begin long-term monitoring of sediment and surface water in contaminated drainages on east side |
| Phase 1b | • Excavation of Material and Ore Recovery from Long Pit (MMP035)<br>• Backfilling and Grading of NW Mine Pit (MMP035) and NW Waste Rock Dump (MWD080)<br>• Continued Grading of SE Waste Rock Dump (MWD082)<br>• Begin installation of PRBs on east side |
| Phase 1c | • Excavation of Material and Ore Recovery from Little Pit (MMP037)<br>• Soil Cover over NW Mine Pit (MMP035) / NW Waste Rock Dump (MWD080)<br>• Soil Cover over SE Waste Rock Dump (MWD082)<br>• Continued installation of PRBs on east side |
| Phase 1d | • Excavation of Material and Ore Recovery from NE Pit (MMP039)<br>• Backfilling of Little Pit (MMP037)<br>• Installation of engineered wetlands downstream of east side PRBs (if needed based on monitoring) |
| Phase 1e | • Grading of NE Waste Rock Dump (MWD084)<br>• Backfilling of NE Pit (MMP039)<br>• Grading and Soil Cover over East Waste Rock Dump (MWD082) |
| Phase 1f | • Continued Grading and Soil Cover of NE Pit (MMP039) and Waste Rock Dump (MWD084)<br>• Backfilling, Grading and Soil Cover over East Pit (MMP040) and East Waste Rock Dump (MWD082)<br>• Grading and Soil Cover of Little Pit (MMP037)<br>• Excavation of Material and Ore Recovery from Mid Pit (MMP036)<br>• Begin long-term monitoring of sediment and surface water in contaminated drainages on west side |

**Table 10.1 – Ballard Mine Summary of RA Phases**

| Phases | RA Mine Pit/Waste Rock Dump Status by Phases |
|---|---|
| Phase 2a | • Continued Ore Recovery from Mid Pit (MMP036)<br>• Continued Backfilling and Grading of Long Pit (MMP035)<br>• Begin installation of PRBs on west side |
| Phase 2b | • Continued Backfilling, Grading, and Soil Cover of Long Pit (MMP035)<br>• Continued Grading of NW Waste Rock Dump (MWD080)<br>• Continued installation of PRBs on west side |
| Phase 2c | • Continued Grading and Soil Cover of Long Pit (MMP035) and NW Waste Rock Dump (MWD080)<br>• Installation of engineered wetlands downstream of west side PRBs (if needed based on monitoring) |
| Phase 2d | • Backfilling of Mid Pit (MMP036)<br>• Initial Grading of SW Waste Rock Dump (MWD081) |
| Phase 2e | • Grading and Soil Cover of Mid Pit (MMP036)<br>• Continued Grading and Soil Cover of SW Waste Rock Dump (MWD081)<br>• Backfilling and Soil Cover of Small Pit (MMP038) |
| Phase 2f | • Reclamation of Borrow Source Areas<br>• Final RA Access Roads |